**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TERRY SPISAK and KEVIN KLEMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware Corporation,<br><br>Defendant. | No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1. Plaintiffs Terry Spisak and Kevin Kleman ("Plaintiffs") bring this action individually and on behalf of all persons in the United States, and in the alternative on behalf of all persons in the state of Ohio, who purchased or leased any model year 2022-2024 Ford Maverick or Ford Maverick Hybrid vehicle equipped with a Connected Touch Radio ("Class Vehicles") against Defendant Ford Motor Company ("Defendant" or "Ford"). The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and as to other matters are made based on an investigation by counsel, including analysis of publicly available information.

2. This is a consumer class action concerning Ford's failure to disclose material facts and safety concerns to consumers.

3. Defendant manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles were being sold with a defect that materially affects the vehicles' ability to operate as intended and to provide safe and reliable transportation. Instead, Ford equipped the Class Vehicles with a defective Connected Touch Radio ("CTR") and rear-view camera system ("Backup Camera") and falsely marketed the vehicles as safe to drive, durable, and reliable.

4. The Class Vehicles' CTR system operates the Backup Camera display, cell phone connectivity, and compatibility with music applications such as Android Auto and Apple CarPlay. The CTR is designed to be the gateway between the driver and the vehicle's safety, communication, and app entertainment features.

5. However, the Class Vehicles' CTRs suffer from a software flaw that causes a component in the end-to-end Backup Camera image processing path to fail, which can cause the Backup Camera image to freeze while the vehicle is in reverse (the "Defect" or the "Frozen Camera Defect"). A frozen image gives the driver a false representation of where the vehicle is relative to its surroundings, increasing the risk of a crash. Ford, whose software can cause the Backup Camera image to freeze while the vehicle is in reverse, sold the vehicles without disclosing that safety risk.

6. The Defect is the result of one or more of the following: (1) flaws in the CTR software such as improper memory handling and/or memory leaking; (2) defects in the design and manufacture of the CTR units supplied to Ford; (3) inadequate testing of the CTR software before it was released into production; and/or (4) poor quality-control procedures which fail to prevent such defective software from being installed in the Class Vehicles.

7. The Defect is inherent in each Class Vehicle and was present at the time of sale or lease to each Class Member. Each of the CTR units installed in the Class Vehicles is identical or substantially similar.

8. The Defect is a safety risk, not a mere inconvenience. When the Backup Camera image freezes while a driver is reversing, the driver is shown an image that no longer reflects the vehicle's actual position relative to people, objects, and vehicles behind it. Consumers have reported nearly hitting pedestrians due to the camera failures, reporting, for example:

> Camera freezes when I'm in reverse. Backed up in to a telephone pole last year and had several thousand dollars in damage. Paid the deductible, my rates went up and my cars value went down. Was backing out of parking space yesterday and almost hit a small child

> when it froze again. Ford needs to fix this issue that they have known about for [*sic*] ahwile.[1]

9. The Defect decreases the value of the Class Vehicles and can endanger drivers, passengers, and bystanders. The Defect also creates uncertainty for the owners and lessees of the Class Vehicles, who cannot rely on their Backup Camera to accurately show what is behind them, even.

10. Despite knowing that the Class Vehicles are equipped with CTR software that can freeze the Backup Camera image, Ford failed to disclose the Defect to consumers at the point of sale and failed to offer a remedy that actually corrects the Defect. Ford's non-disclosure and omission of the Defect artificially inflated the purchase and lease price for these vehicles. Had Ford disclosed the Defect, Plaintiffs and the Class members would not have purchased their vehicles or would have paid less for them.

11. Federal law imposes a duty upon automobile manufacturers including Ford to ensure that, before selling vehicles, they function properly and safely and are free from material defects which undermine the ability of the vehicle to provide safe, reliable transportation. Federal law further requires that when an automobile manufacturer discovers a defect, it must disclose the defect and remedy the problem or cease selling the car. Further, when a company provides a warranty, it must honor that warranty. Ford failed to honor its warranties by providing only an ineffective software update, sold vehicles that could not provide safe, reliable transportation, and failed to timely disclose the Class Vehicles' safety defect.

12. Plaintiffs and members of the Classes reasonably expected that the Backup Cameras in their vehicles would accurately display the area behind the vehicle while the vehicle was in reverse, and that Ford would not omit material information about safety-related defects. In reality, however, Defendant concealed and failed to disclose to Plaintiffs and the Class Members

---

[1] *See* Consumer Complaint, NATIONAL HIGHWAY SAFETY ADMINISTRATION ("NHTSA"), https://www.nhtsa.gov/?nhtsaId=11643901 (last visited November 6, 2026).

the Defect and its significant safety risk, including a frozen image that falsely represents where the vehicle is relative to its surroundings. Moreover, Defendant concealed that, as a result of the Defect, Class Members would be required to bring their vehicles in for repair and that the repair might not correct the Defect.

13. Based on warranty claims, consumer complaints, including VOQs submitted to NHTSA, and testing done in response to those complaints, as well as other sources of internal data not available to consumers, Defendant was aware of the Defect in the Class Vehicles but concealed the Defect from Plaintiffs and members of the Classes. Indeed, despite being aware of the Defect and numerous complaints, Ford knowingly, actively and affirmatively omitted and/or concealed the existence of the Defect to increase profits by selling additional Class Vehicles.

14. Ford has exclusive knowledge of, and has been in exclusive possession of, information pertaining to the Defect, which was material to Plaintiffs and Class Members, who could not reasonably know of the Defect. Ford has not disclosed the Defect to the purchasers or lessees, like Plaintiffs, at the point of purchase or through advertisements or marketing materials. Such full and complete disclosures would have influenced Class Members' purchase decisions and the purchase price they paid. Under all circumstances, Ford had a duty to disclose the latent Defect at the point of sale of the Class Vehicles. Instead, Ford failed and refused to disclose the Defect at the point of sale and has failed to provide a meaningful remedy to those who have suffered economic harm as a result of the Defect.

15. The Defect is latent, it presents a safety risk to drivers, passengers, and bystanders, and it renders Class Vehicles equipped with the defective CTR software unfit for the ordinary use of providing safe and reliable transportation. As such, the Defect presents a breach of the implied warranty of merchantability.

16. Additionally, because Ford concealed and failed to disclose the Defect, owners have suffered and continue to suffer substantial damages and should be entitled to the benefits of all tolling and estoppel doctrines.

17. As a direct and proximate result of Ford's concealment of, and failure to disclose, the Defect, Plaintiffs and Class members: (1) overpaid for the Class Vehicles because the Defect significantly diminishes the value of the Vehicles; (2) have Vehicles whose Backup Camera image can freeze while in reverse; (3) have expended and must expend time and money to have their Vehicles inspected and repaired; (4) have vehicles that have a lower resale value; and (5) are not able to use their Vehicles' Backup Cameras for their intended purpose.

18. Ford breached its express and implied warranties through which Ford promised to, inter alia: (1) provide Class Vehicles fit for the ordinary purpose for which they were sold; and (2) repair, replace, or adjust, without charge, parts that malfunction or fail due to a manufacturing defect in factory-supplied materials or factory workmanship, including the CTR and its software. Because the Defect was present at the time of sale or lease of the Class Vehicles and concealed from Plaintiffs and members of the Classes, Ford was required to repair or replace these components under the terms of the warranties, yet Ford has failed to correct the Defect.

19. Ford's decision to sell the Class Vehicles without disclosing its specialized knowledge of the Defect also violates the consumer protection laws, including those of Ohio.

20. Plaintiffs and Class members have purchased and leased Class Vehicles that they would not otherwise have purchased or leased, or would have paid less for, had they known of the Defect at the point of sale. Plaintiffs and Class members have consequently suffered ascertainable losses and actual damages. Moreover, Plaintiffs seek equitable remedies, including inter alia, an order that the Class Vehicles are defective and injunctive relief preventing Ford from continuing its wrongful conduct as alleged herein.

## I. The Parties

**<u>Plaintiff Terry Spisak</u>**

21. Plaintiff Terry Spisak is an Ohio citizen who resides in Cleveland, Ohio.

22. In or around June 2023, Plaintiff Spisak purchased a new 2023 Ford Maverick from a Ford-authorized dealership, AutoNation Ford Westlake, in Westlake, Ohio. The vehicle had

approximately 230 miles on the odometer at the time of purchase, and Plaintiff Spisak financed the purchase through Ford Credit at an approximate cost of $29,000.

23. Plaintiff Spisak purchased his Class Vehicle primarily for personal, family, or household use.

24. Plaintiff Spisak researched the vehicle before purchasing it beginning when the first model was released as a pickup truck in 2021. He looked at the Ford website, the dealership website, and even submitted an order via the Ford website that directed him to the dealership. He originally purchased a 2022 Ford Maverick and then traded it in for the 2023 model vehicle. He continued to research the vehicle up until his purchase in June 2023.

25. None of the information provided to Plaintiff Spisak disclosed the Defect. Ford's omissions were material to Plaintiff Spisak.

26. Had Ford disclosed the Defect before Plaintiff Spisak purchased his vehicle, he would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff Spisak would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

27. At all times during his ownership of the vehicle, Plaintiff Spisak properly maintained and serviced his Class Vehicle according to Ford's recommended maintenance guidelines.

28. Plaintiff Spisak's vehicle has experienced the Defect. The images on the backup camera freeze off and on at times, and the camera displays distorted images, while the vehicle is in reverse. He began to notice the freezing images and distorted images within his first year of purchase in 2023.

29. Plaintiff Spisak's vehicle has been the subject of multiple recalls, including the backup camera Recall. Plaintiff Spisak received Recall notice, and the backup camera software update was performed on his vehicle.

30. The Recall software update did not cure the Defect. The backup camera freezing and distortion continued to occur after and despite the software update and the Recall notices, and

the issues are ongoing. Plaintiff Spisak's vehicle also continues to suffer from other computer issues.

31. Plaintiff Spisak's vehicle now has approximately 90,000 miles on the odometer and continues to exhibit the Defect.

32. Plaintiff Spisak did not pay directly for any repair, but he incurred time and travel expenses in taking his vehicle to the dealership in response to Recall notices. As a result of the Defect, Plaintiff Spisak also overpaid for his vehicle, owns a vehicle with diminished value, and has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation.

33. Plaintiff Spisak will be unable to rely on the Class Vehicle's advertising or labeling in the future and so will not purchase or lease another Class Vehicle, although he would like to do so.

34. At all times, Plaintiff Spisak, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Plaintiff Kevin Kleman**

35. Plaintiff Kevin Kleman is an Ohio citizen who resides in Ludlow Falls, Ohio.

36. In or around February 2023, Plaintiff Kleman purchased a new 2023 Ford Maverick Hybrid from a Ford-authorized dealership, Beau Townsend Ford in Vandalia, Ohio.

37. Plaintiff Kleman purchased his Class Vehicle primarily for personal, family, or household use.

38. Plaintiff Kleman became aware of the Ford Maverick through a radio advertisement. He looked up the vehicle online, on the Ford website and dealer website, and then went to the dealership to order the vehicle. Safety and reliability were important factors in his purchasing decision.

39. None of the information provided to Plaintiff Kleman disclosed the Defect. Ford's omissions were material to Plaintiff Kleman.

40. Had Ford disclosed the Defect before Plaintiff Kleman purchased his vehicle, he would have seen such disclosures and been aware of them. Like all members of the Class, Plaintiff Kleman would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

41. At all times during his ownership of the vehicle, Plaintiff Kleman properly maintained and serviced his Class Vehicle according to Ford's recommended maintenance guidelines.

42. Plaintiff Kleman's vehicle has experienced the Defect. The images on the backup camera freeze off and on at times, and the camera displays distorted images, while the vehicle is in reverse, and sometimes stay on screen when the vehicle is in drive. Within the first year of ownership, in 2023, Plaintiff Kleman began experiencing the Defect. Specifically, Plaintiff remembers backing up out of a hotel parking lot while on vacation around June 2024 and, while he was in reverse, he noticed the Backup Camera image freezing.

43. Plaintiff Kleman's vehicle has been the subject of multiple recalls, including the Recall. Plaintiff Kleman received Recall notice, and the backup camera software update was performed on his vehicle.

44. The Recall software update did not cure the Defect. The backup camera freezing and distortion continued to occur after and despite the software update and the Recall notices, and the issues are ongoing. Recently, around October 2026, Plaintiff's backup camera showed a distorted image while Plaintiff was trying to reverse.

45. On or around November 10, 2026, Plaintiff Kleman contacted Beau Townsend Ford and spoke to a service technician to inform Ford the Recall software update did not fix the Defect. The Ford Dealer technician informed Plaintiff that no other repair was available, any other repair would not be covered under warranty, and the fix to the Backup Camera would not be available until February 2027.

46. Plaintiff Kleman's vehicle now has approximately 76,099 miles on the odometer and continues to exhibit the Defect.

47. Plaintiff Kleman did not pay for the Recall software update, but the repair did not fix the Defect. As a result of the Defect, Plaintiff Kleman also overpaid for his vehicle, owns a vehicle with diminished value, and has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation.

48. Plaintiff Kleman will be unable to rely on the Class Vehicle's advertising or labeling in the future and so will not purchase or lease another Class Vehicle, although he would like to do so.

49. At all times, Plaintiff Kleman, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Defendant**

50. Defendant Ford Motor Company is a Delaware corporation with its principal place of business in Dearborn, Michigan.

51. Ford, through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases vehicles, including the Class Vehicles, nationwide and in Delaware. Ford is the warrantor and distributor of the Class Vehicles in the United States.

52. At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

53. In order to sell vehicles to the general public, Ford enters into agreements with dealerships who are then authorized to sell Ford-branded vehicles such as the Class Vehicles to consumers such as Plaintiffs. These agreements also designate the authorized dealerships to conduct warranty and recall repairs on Ford's behalf. Per the agreements between Ford and the authorized dealers, consumers such as Plaintiffs can receive services under Ford's issued warranties at dealer locations that are convenient to them. As such, Ford directly profits from all sales of new vehicles at authorized Ford dealerships.

54. Ford also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. Ford is also responsible for the production and content of the information on the Monroney Stickers, as well as other window stickers.

## II. JURISDICTION AND VENUE

55. This action is properly before this Court, and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than Ford, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. See 28 U.S.C. § 1332(d)(2)(A).

56. In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding. Further, this Court may also exercise supplemental jurisdictions over Plaintiffs' Magnuson-Moss Warranty Act claims.

57. This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as Ford is "at home" in Delaware.

58. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions that give rise to the claims occurred in this District. Plaintiffs may properly sue Ford in this District, Ford's state of incorporation.

## III. FACTUAL ALLEGATIONS

**A. The Connected Touch Radio and Frozen Camera Defect in the Class Vehicles**

59. Automobile infotainment systems—built-in computers and related component parts—deliver entertainment and information to the driver and the passengers through audio/ video interfaces, control elements like touch screen displays, button panels, voice commands, and more.

60. Since NHTSA passed a final rule in 2014 requiring rear-view cameras on all new vehicles under 10,000 pounds by May 2018,[2] automobile infotainment systems incorporating rear-view camera images on a central touchscreen are now standard.

61. In the Class Vehicles, Ford introduced the Connected Touch Radio ("CTR") infotainment system, featuring 8-inch touchscreens. The CTR system was used exclusively on base-trim variants of Ford Maverick vehicles.[3]

62. The Class Vehicles' CTR system operates the Backup Camera display, cell phone connectivity, and compatibility with music applications such as Android Auto and Apple CarPlay.[4]

63. When the vehicle is in reverse, the CTR screen displays an image from the Backup Camera intended to show the driver where the vehicle is relative to its surroundings. The live video feed from the Backup Camera is processed by the Class Vehicles' CTR.

64. Indeed, Ford touted the Backup Camera reliability as part of the Class Vehicles' "technologies that drive confidence" on the 2023 Ford Maverick product page:[5]

---

[2] *See* NHTSA Announces Final Rule Requiring Rear Visibility Technology (Mar. 31, 2014) https://www.transportation.gov/briefing-room/nhtsa-announces-final-rule-requiring-rear-visibility-technology (last visited November 5, 2026) (announcing issuance of final rule codified at 49 CFR § 571.111).

[3] *See* 2022 Ford Maverick Debuts Connected Touch Radio: Exclusive, FORD, https://fordauthority.com/2021/07/2022-ford-maverick-debuts-connected-touch-radio-exclusive/ (last visited November 5, 2026).

[4] *See id.*

[5] 2023 Ford Maverick Product Page, FORD (June 21, 2023) https://web.archive.org/web/20230621103046/https://www.ford.com/trucks/maverick/ (captured through the Wayback Machine Web Archive); 2023 Maverick Productivity Features Page, FORD (July 21, 2023) https://web.archive.org/web/20230721115248/https://www.ford.com/trucks/maverick/2023/features/productivity/#technologiesdriveconfidence (captured through the Wayback Machine Web Archive).

## TECHNOLOGIES THAT DRIVE CONFIDENCE

Feel more connected and secure behind the wheel of your Maverick® truck with the FordPass® App[164] and Ford Co-Pilot360™ Technology.



### FORDPASS® APP

Put remote start/stop, roadside assistance[166] and connectivity[5] in the palm of your hand.

Meet FordPass



### FORD CO-PILOT360™ TECHNOLOGY

Boost your confidence on the road with standard features like auto high-beam headlamps, rear view camera and more.[10]

See All Features

## REAR VIEW CAMERA

Between glancing in the rear view mirror and craning your neck, backing up can be a pain. The Rear View Camera[10] makes it easier to get a great view of what's behind your vehicle. Just make sure to keep the camera lens free of debris like snow or dust and you can reverse with confidence.

65. But instead of showing "a great view of what's behind [the] vehicle," a flaw in the CTR software causes a component in the live feed processing path to fail, resulting in images that freeze or lag in time while the vehicle is being driven in reverse. A consumer could not have reasonably discovered the Defect before purchasing or leasing a Class Vehicle.

66. Discovery will show that all of the Class Vehicles have the same CTR units and the same defective CTR software at time each Class Vehicle left Ford's possession and control. As such, each Class Vehicle had an inherent and uniform latent Defect. The Defect is the result of one or more of the following: (1) flaws in the CTR software such as improper memory handling and/or memory leaking; (2) defects in the design and manufacture of the CTR units supplied to Ford; (3) inadequate testing of the CTR software before it was released into production; and/or (4) poor

quality-control procedures which fail to prevent such defective software from being installed in the Class Vehicles.

67. Backup cameras are a critical safety feature in automobiles. Back-over crashes kill hundreds of people each year and injure thousands more.[6] Recognizing the danger posed by back-over crashes, in 2008 Congress passed the Cameron Gulbransen Kids Transportation Safety Act of 2007, requiring regulators to expand the required field of view for motor vehicles so that drivers can detect areas behind the vehicle, with particular attention to incidents involving small children and disabled persons. In 2014, the National Highway Traffic Safety Administration ("NHTSA") implemented that mandate by amending Federal Motor Vehicle Safety Standard ("FMVSS") No. 111, 49 C.F.R. § 571.111, to require a rear-visibility system in new light vehicles, which in practice means a backup camera.[7] The requirement was fully phased in for vehicles manufactured on or after May 1, 2018.[8]

**B. Ford's Warranties**

68. Ford provided all purchasers or lessees of the Class Vehicles with a New Vehicle Limited Warranty ("NVLW"). The NVLW for the Class Vehicles included a "Bumper to Bumper" warranty for 3 years or 36,000 miles, whichever occurs first, promising that authorized Ford Motor Company dealers will, "without charge, repair, replace, or adjust all parts on [the] vehicle that

---

[6] NHTSA, DOT HS 811 144, FATALITIES AND INJURIES IN MOTOR VEHICLE BACKING CRASHES 6 (Nov. 2008) available at Fatalities & Injuries in Motor Vehicle Backing Crashes (Report to Congress).pdf.

[7] Federal Motor Vehicle Safety Standards; Rear Visibility, 79 Fed. Reg. 19178 (Apr. 7, 2014) (Docket No. NHTSA-2010-0162) NHTSA issued the rule to reduce back over crashes and satisfy the Act's mandate, expanding the required field of view for passenger cars, trucks, multipurpose passenger vehicles, buses, and low-speed vehicles under 10,000 pounds. Available at https://www.govinfo.gov/content/pkg/FR-2014-04-07/html/2014-07469.htm

[8] *Id.*

malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."[9]

69. The terms of these warranties are non-negotiable and Ford exercises sole authority in determining whether and to what extent a particular repair is covered under the warranties it offers.

70. Ford's Warranty Guide states that Ford and its dealers reserve the right to provide post-warranty repairs, conduct recalls, or extend the warranty coverage period for certain vehicles or vehicle populations, at the sole discretion of Ford.

71. Moreover, Ford's authorized dealerships also sell extended warranties from third-party suppliers. However, those warranties exclude manufacturer's defects, including those like the Defect.

**C. Ford's Omissions Regarding the Class Vehicles**

72. Notwithstanding Ford's knowledge of the Defect, as more specifically explained herein, Ford failed to disclose the Defect to consumers at the time of sale. The most basic task of a Backup Camera is to show the driver what is behind the vehicle, but Ford failed to disclose the CTR's inability to accurately depict a real-time feed of the Backup Camera in any of its statements about the Class Vehicles, including in brochures, Monroney Stickers, warranty booklets, and owner's manuals.

73. Ford had numerous opportunities to warn prospective purchasers that the Class Vehicles contained a defect that could cause the Backup Camera image to freeze while in reverse, with an associated safety risk of a crash. But none of the statements that Ford published and distributed about the vehicles, including brochures, commercials, fact sheets, window stickers, warranty booklets, and owner's manuals contained any mention of the Defect.

---

[9] Ford Motor Company, 2023 Model Year Ford Warranty Guide (Sept. 2023, Seventh Printing) (the "Warranty Guide"), available at: 23MYUS_Ford_Car_LT_truck_WTY_V8.pdf(last visited November 4, 2026).

74. Ford also makes express representations and warranties about the Class Vehicles in the NVLW. However, in truth, Ford knew before selling certain of the Class Vehicles that they suffered from the Defect, but never disclosed that knowledge. Had Ford disclosed that knowledge, Plaintiffs and Class members would not have purchased their vehicles or would not have purchased them for the same price.

**D. Ford Had Exclusive and Superior Knowledge of the Defect**

75. Ford fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiffs and members of the Class the Defect in Class Vehicles, even though Ford knew or should have known of the design, material, manufacturing, and/or workmanship defects in the Class Vehicles.

76. Ford is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Ford conducts tests, including pre-sale durability testing, on incoming components, including the engines, to verify the parts are free from defect and align with Ford's specifications. In particular, Ford has extensive proving grounds and testing facilities to ensure that prototype engines and other vehicle components meet specifications and to test for unforeseen defects in design and manufacture. Ford has such facilities in Thailand, India, Australia, the Middle East, China, and throughout the United States, including the extensive Dearborn Development Center located in Dearborn, Michigan, and Mexico. Ford touts that "The range and intensity of tests that Ford puts its cars through at its facilities across the region are designed to ensure maximum performance and safety even under the harshest conditions."[10]

77. Knowledge and information regarding the Defect were in the exclusive and superior possession of Ford and its network of authorized dealerships, and that information was not provided to Plaintiffs and members of the Classes, either before their purchase or lease of Class

---

[10] Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit, Ford Media Center (July 10, 2019), https://web.archive.org/web/20201105064524/https://media.ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html (captured via Wayback Machine Web Archive)

Vehicles or when they sought repairs for their vehicles. Based on warranty claims, early consumer complaints made to Ford, testing of the CTR and the Class Vehicles themselves, aggregate warranty data, and consumer complaints to NHTSA, inter alia, Ford was aware or should have been aware of the Defect in the Class Vehicles. Instead, Ford concealed the Defect and its associated safety risk from Plaintiffs and members of the Classes.

78. Ford knew, or should have known, that the Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles or within applicable warranty periods.

79. Notwithstanding Ford's exclusive and superior knowledge of the Defect, Ford failed to disclose the Defect to consumers at the time of purchase or lease of the Class Vehicles and continued to produce and sell Class Vehicles suffering from the Defect. Ford intentionally concealed that the Defect presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public.

**E. Ford's Investigation and Recall of the Defect**

80. After receiving a report of the rear-camera Defect in April 2022, Ford issued a recall targeting the Class Vehicles' CTR Defect.

81. Through its investigation during the recall process, Ford and the CTR supplier conducted stress testing and identified a defect in the Class Vehicles' software in which a memory leak could result in a frozen Backup Camera display image, along with other symptoms, and also identified additional software vulnerabilities that could result in the rear-view image not appearing or being delayed.[11]

82. Pursuant to the Recall, owners "were instructed to take their vehicle to a Ford or Lincoln dealer to have the CTR software updated" free of charge, and owners who previously paid

---

[11] *See* Part 573 Safety Recall Report 24V-684, p. 2.

for the software update at their own expense before notification of the safety recall in May 2023 were eligible for reimbursement.[12]

83. As of Ford's most recent quarterly report, submitted October 26, 2026, Ford reported that 201,345 vehicles of the 273,701 recall population had been remedied.[13]

84. Despite Ford's statement that the vehicles had been "remedied," the Recall's remedy was clearly insufficient and ineffective. On October 23, 2026, NHTSA's Office of Defects Investigation (ODI) opened Recall Query RQ26-004, prompted by owner questionnaires indicating that frozen Backup Camera images persisted after receiving the recall remedy. The ODI also reported that it "is aware of a redacted number of related failures reported to ODI by Ford."[14]

85. NHTSA's public complaint database contains at least twenty to thirty complaints regarding the Defect, including complaints from consumers whose vehicles received the Recall remedy but who continue to experience problems.

86. Despite the Recall, the Class Vehicles continue to experience the Defect. These include Class Vehicles that received the Recall software update, as shown by Plaintiffs' experiences, the VOQs described above, and the Recall Query, and they include Ford Maverick Hybrid vehicles, which NHTSA has included within the scope of the Recall Query.

87. In addition to Ford's own internal testing, investigation and knowledge of the Defect, customers complained on the NHTSA's website.

88. Federal law requires automakers like Ford to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to

---

[12] *See* Part 573 Safety Recall Report 24V-684, p. 3.

[13] *See* Ford Motor Company, Recall Quarterly Report, NHTSA Recall No. 24V-684 (last updated Oct. 26, 2026), available at https://static.nhtsa.gov/odi/rcl/2024/RCLQRT-24V684-4460.pdf.

[14] *See* NHTSA Office of Defects Investigation, ODI Resume, Investigation RQ26-004, available at https://static.nhtsa.gov/odi/inv/2026/INOA-RQ26004-19222.pdf.

NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

89. Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id*.

90. Consumers may file vehicle safety-related complaints through the NHTSA website, where they are logged and published. The customer complaints are easily sorted by make, model, and year of vehicle. Based on the legal obligations discussed above, Ford and/or Ford personnel would review NHTSA's website for complaints. Thus, Ford knew or should have known of the complaints about the Defect logged by NHTSA ODI. With respect solely to the Class Vehicles, attached hereto as **Exhibit A,** is a sampling of these complaints filed with the NHTSA for the Class Vehicles, which are available on the NHTSA's website, www.nhtsa.gov. In addition to complaints in Exhibit A detailing consumer complaints as early as 2022, the below examples specifically include consumers whose vehicles received the Recall remedy but who continue to experience the Defect.

91. A consumer with a 2023 Ford Maverick reported an August 7, 2025 incident, stating, "I have previously had the backup camera recall repaired/updated the software and it worked fine for awhile. This week I had it freeze up on me and almost cause me to back end to another vehicle."[15]

92. A consumer with a 2024 Ford Maverick reported an December 14, 2025 incident, stating, "I have the latest software update as of June 2025, recently when I shifted from reverse to

[15] Consumer Complaint, NHTSA, https://www.nhtsa.gov/?nhtsaId=11634888

Drive, the display stuck in backup camera picture. I have to put it back to Park and try again to drive and get to driving map display screen."[16]

93. A consumer with a 2024 Ford Maverick reported a May 20, 2025 incident to NHTSA, in relevant part: "The contact received notification of NHTSA Campaign Number: 24V684000 (BACK OVER PREVENTION), and the vehicle was taken to a local dealer and the recall repair was performed; however, several weeks later the failure occurred while the contact was reversing, and the rearview camera display remained frozen. There was no warning light illuminated. . . ."[17]

**F. Ford Has Unjustly Retained a Substantial Benefit**

94. Plaintiffs allege that Defendant unlawfully failed to disclose the alleged Defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

95. Plaintiffs further allege that Defendant, thus, engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' vehicles.

96. As discussed above, therefore, Plaintiffs allege that Defendant unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Defect.

97. Accordingly, Defendant's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

**G. The Relationship Between Ford and its Network of Authorized Dealerships related to Ford's Warranties**

98. In order to sell vehicles to the general public, Defendant enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Defendant-branded vehicles, the

---

[16] Consumer Complaint, NHTSA, https://www.nhtsa.gov/?nhtsaId=11705413

[17] Consumer Complaint, NHTSA, https://www.nhtsa.gov/?nhtsaId=11662294

authorized dealerships are also permitted under these agreements with Defendant to service and repair these vehicles under the warranties Defendant provides directly to consumers who purchased new vehicles from the authorized dealerships.

99. Accordingly, Defendant's authorized dealerships are Defendant's agents, and the consumers who purchase or lease Defendant vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Defendant vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

100. Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

101. Defendant issued the express warranty to the Plaintiffs and the Class members.

102. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendant also is responsible for the content of the Monroney Stickers on Defendant-branded vehicles. Because Defendant issues the express warranty directly to the consumers, the consumers are in direct privity with Defendant with respect to the warranties.

103. In promoting, selling, and repairing its Class Vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive

Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

a) The authorized Ford dealerships complete service and repair, including recall repairs, according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, service bulletins, recall notices, and other documents;

b) Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

c) The warranties provided by Defendant for the Class Vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

d) Defendant dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

e) Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning Class Vehicles, and the dealerships are able to perform repairs under warranty only with Defendant's authorization;

f) Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public; and

g) Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address the Defect by performing the CTR software update under the Recall.

104. Indeed, Ford's Warranty Guide makes it abundantly clear that Ford's authorized dealerships are Ford's agents for vehicle sales and service. The Warranty Guide, which is plainly

written for the consumers, not the dealerships, tells consumers repeatedly to seek repairs and assistance at its "authorized dealerships."

105. For example, at the outset, Ford notifies Plaintiffs and class members in the Warranty Guide that "[w]hen you need warranty repairs, your selling dealer would like you to return to it for that service, but you may also take your vehicle to another Ford Motor Company dealership authorized for warranty repairs," and that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship." Ford's Warranty Guide also directs consumers who have a concern to first contact the selling or servicing dealership.

106. Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendant. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Defendant or its agent dealerships to establish privity of contract between Defendant, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendant.

## IV. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Fraudulent Concealment

107. As previously described, any applicable statute(s) of limitations has been tolled by Ford's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the nature of the Defect prior to this class action litigation being commenced.

108. Ford was and remains under the continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of the Class Vehicles, and it will require costly repairs, poses a safety concern, and diminished the resale value of the Class Vehicles. As a result of the active concealment by Ford, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

109. Ford has known of the Defect in the Class Vehicles since before April 2022, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Defect to this day. To Plaintiffs' knowledge, Ford has not disclosed to Plaintiffs, Class members, or the public that its Recall remedy fails to cure the Defect in vehicles that received it.

**B. Estoppel**

110. Ford was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. Ford actively concealed – and continues to conceal—the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles. Plaintiffs and Class members reasonably relied upon Ford's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, Ford is estopped from relying on any statutes of limitation in defense of this action.

**C. Discovery Rule**

111. The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles suffered from the Defect.

112. However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until—at the earliest—after the Backup Camera image in their vehicles froze.

113. Even then, Plaintiffs and Class members had no reason to know that the freezing of the Backup Camera image was caused by a defect in the Class Vehicles because of Ford's active concealment of the Defect. Until the Recall, Ford did not notify Plaintiffs or Class members about the Defect, and even after the Recall, Class members whose vehicles received the software update continue to experience the Defect.

114. Thus, Plaintiffs and Class members were not reasonably able to discover the Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence,

and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing the Backup Camera image in their Vehicles to freeze.

## V. Class Allegations

115. Plaintiffs bring this action pursuant to Rule 23(a), 23(b)(2) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and as the following proposed classes:

> **Nationwide Class**: All persons or entities who purchased or leased a 2022-2024 Ford Maverick or Ford Maverick Hybrid vehicle equipped with a Connected Touch Radio ("Class Vehicle") in the United States.
>
> **Ohio Sub-Class**: All persons or entities that purchased or leased a Class Vehicle within Ohio.

116. Excluded from the Class are Defendant; its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Defendant; Defendant's dealers; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

117. Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

118. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

119. **Numerosity**. Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough that such joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Ford's possession, custody, and/or control as well as from records kept by the Department of Motor Vehicles.

120. **Commonality and Predominance**. Rules 23(a)(2) and (b)(3) of the Federal Rule of Civil Procedure: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to the following:

a) Whether Class Vehicles suffer from the Defect;

b) Whether Ford engaged in the conduct alleged herein;

c) Whether the Defect constituted an unreasonable safety risk;

d) Whether the Defect constitutes a material fact;

e) Whether Ford's Recall remedy (the CTR software update) adequately corrects the Defect;

f) Whether Ford designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

g) Whether Ford designed, manufactured, marketed, and distributed Class Vehicles with the Defect;

h) Whether Defendant has a duty to disclose the defective nature of the CTR software to Plaintiffs and Class Members;

i) Whether Plaintiffs and Class members overpaid for their Class Vehicles and/or did not receive the benefit of the bargain;

j) Whether Defendant should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the Defect and any defective CTR components;

k) Whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount;

l) Whether Ford's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false

promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

m) Whether Ford has been unjustly enriched under applicable state laws;

n) Whether Ford has violated its express warranties to Plaintiffs and Class members;

o) Whether Defendant breached the implied warranty or merchantability pursuant to the laws governing each of the Sub-Class jurisdictions;

p) Whether Ford violated the consumer protection act Ohio;

q) Whether Ford actively concealed the Defect in order to maximize profits to the detriment of Plaintiffs and Class members; and

r) Such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

121. **Typicality**. Plaintiffs' claims are typical of the claims of the Class and Sub-Classes in that Plaintiffs, like all Class Members, purchased a Class Vehicle designed, manufactured, and distributed by Ford. The representative Plaintiffs, like all Class Members, have been damaged by Ford's misconduct in that they overpaid for vehicles with the Defect, own vehicles with diminished value, and have incurred time and expense presenting their vehicles for repairs that did not cure the Defect. Rule 23(a)(3) of the Federal Rules of Civil Procedure: Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above. All claims seek recovery on the same legal theories and are based upon Ford's common course of conduct.

122. **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

123. **Declaratory Relief**. Rule 23(b)(2) of the Federal Rules of Civil Procedure: Ford has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

124. **Superiority**. Rule 23(b)(3) of the Federal Rules of Civil Procedure: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for Class members to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI. Causes of Action

### COUNT I
### Fraud by Omission or Fraudulent Concealment
### (On behalf of the Nationwide Class, or in the Alternative, on Behalf of all Sub-Classes against Defendant))

125. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 135 above as if fully set forth herein.

126. Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class, or in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

127. Ford knew that the Class Vehicles suffered from an inherent Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

a) Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

b) Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

c) Defendant was in a superior position to know the true state of facts about the safety defect suffered by the Class Vehicles;

d) The omitted facts were material because they directly impact the safety of the Class Vehicles;

e) Defendant knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

f) Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

g) Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

128. The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. A Backup Camera image that freezes while the vehicle is in reverse gives the driver a false representation of the vehicle's surroundings and increases the risk of a crash, thereby putting consumers, passengers, and bystanders in danger; that is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

129. Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects suffered by the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiff's and Class Members' purchase or lease of Defendant's defective Class Vehicles.

130. Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

131. As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the Class Vehicles and obtain restitution or (b) affirm their purchase or lease of the Class Vehicles and recover damages.

132. Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II
**Unjust Enrichment**
**(On Behalf of the Class, or, in the Alternative, on Behalf of all Sub-Classes against Defendant))**

133. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 135 above as if fully set forth herein.

134. Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendant.

135. Ford has received and retained a benefit from Plaintiffs and all Class Members and inequity has resulted.

136. Ford has benefitted from selling and leasing defective cars whose value was artificially inflated by Ford's concealment of the Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs.

137. As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, Ford charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid than higher price for their vehicles to Ford's authorized distributors and dealers, which are in Ford's control.

138. All Class members conferred a benefit on Ford.

139. It is inequitable for Ford to retain these benefits.

140. Plaintiffs and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from Ford's conduct.

141. Ford knowingly accepted the benefits of its unjust conduct.

142. As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

143. Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

144. Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not suffer from the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT III

**Violation of the Magnuson-Moss Warranty Act (15 U.S.C. § 2301)**
**(On Behalf of Plaintiffs Individually against Defendant)**

145. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 135 above as if fully set forth herein.

146. Plaintiffs bring this count on behalf of themselves individually against Defendant.

147. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

148. Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

149. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

150. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

151. Defendant's implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

152. Defendant's express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

153. Defendant breached the implied warranty and the express warranty by virtue of the above-described acts.

154. Plaintiffs notified Defendant of the breach within a reasonable time and/or were not required to do so. Ford was also on notice of the Defect from, among other sources, the complaints and service requests it received from Class Members and its dealers.

155. Defendant's breach of the implied warranty and express warranty deprived Plaintiffs of the benefits of their bargains.

156. Because Plaintiffs purchased their vehicles from an authorized Ford dealership, they are in privity with Defendant. Plaintiffs have had sufficient direct dealings with Ford and its agents (dealerships and customer support personnel) to establish privity of contract between Ford, on one hand, and Plaintiffs, on the other hand. Furthermore, Ford provided warranties directly to Plaintiffs, and Plaintiffs are the intended beneficiaries of Ford's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

157. Nonetheless, privity is not required here because Plaintiffs are the intended third-party beneficiaries of contracts between Ford and its dealerships. These contracts give the

dealerships the right to sell Ford brand vehicles, as well as service and perform warranty repairs on Ford's behalf. Plaintiffs are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products Ford distributes to its authorized dealerships. Plaintiffs also have the right to receive service and warranty work at dealerships located more conveniently to them than Ford's headquarters.

158. Ford breached these warranties, as described in more detail above. Without limitation, the Class Vehicles suffer from a Defect that puts vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect in that they were manufactured with the same defective CTR software. Contrary to Ford's representations about its vehicles, the Class Vehicles are defective in manufacture, materials and/or workmanship and are unsafe.

159. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Ford has long been on notice of the Defect and, despite performing the Recall software update on Plaintiffs' vehicles, has not provided a remedy that cures it.

160. At the time of sale of Plaintiffs' vehicles, Ford knew, should have known, or was reckless in not knowing of its omissions concerning the Class Vehicles' Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect. Ford's Warranty Guide states that consumers are required to submit warranty disputes to BBB AUTO LINE before exercising rights under the Magnuson-Moss Warranty Act. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

161. Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Ford is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

162. Plaintiffs provided notice to Ford of their claims under the MMWA via letter dated November 6, 2026.

163. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

164. Plaintiffs, individually, seek all damages permitted by law, in an amount to be proven at trial.

**<u>Claims on Behalf of the Ohio Sub-Class</u>**

**<u>COUNT IV</u>**
**Breach of Express Warranty**
**Ohio Rev. Code Ann. § 1302.26, et seq.**
**(On Behalf of the Ohio Sub-Class against Defendant)**

165. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 135 above as if fully set forth herein.

166. Plaintiffs Spisak and Kleman ("Ohio Plaintiffs") bring this count individually and on behalf of the Ohio Sub-Class against Defendant.

167. Ford is and was at all relevant times a "merchant" with respect to motor vehicles Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

168. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(20).

169. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

170. The CTRs, including their software, were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

171. Ford provided all purchasers of the Class Vehicles with an express warranty, including Ford's NVLW, which became a material part of the bargain. Accordingly, Ford's express warranty is an express warranty under Ohio law.

172. Ford expressly warranted that the Class Vehicles were of high quality and, at a minimum, would function properly. Ford specifically warranted attributes and qualities of the Backup Camera in the Vehicles as detailed above, including with respect to performance, quality, operability, convenience, and safety.

173. Ford's NVLW provides, in relevant part, that authorized Ford dealers will, without charge, repair, replace, or adjust all parts on the vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

174. According to Ford, the Bumper to Bumper warranty lasts for 3 years or 36,000 miles, whichever occurs first.

175. The warranties formed the basis of the bargain that was reached when Ohio Plaintiffs and other members of the Ohio Sub-Class purchased their Class Vehicles.

176. Although Ford was obligated to correct the Defect, none of the attempted fixes are adequate under the terms of the Warranties, as they did not cure the defect.

177. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the Class Vehicles pursuant to the express Warranties, Ford performed ineffective procedures including software updates, and/or replaced defective components with equally defective components, without actually repairing the Class Vehicles. Moreover, when providing the Recall software update for any Class members, Ford's repair was ineffective and incomplete and did not provide a permanent repair for the Defect.

178. Because Ohio Plaintiffs purchased their vehicles from authorized Ford dealerships, they are in privity with Defendant. Ohio Plaintiffs and the members of the Ohio Sub-Class have had sufficient direct dealings with Ford and its agents (dealerships and customer support personnel) to establish privity of contract between Ford, on one hand, and Ohio Plaintiffs and the members of the Ohio Sub-Class, on the other hand. Furthermore, Ford provided warranties directly to Ohio Plaintiffs and the members of the Ohio Sub-Class, and Ohio Plaintiffs and the members of the Ohio Sub-Class are the intended beneficiaries of Ford's express and implied warranties. The

dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

179. Nonetheless, privity is not required here because Ohio Plaintiffs and the members of the Ohio Sub-Class are the intended third-party beneficiaries of contracts between Ford and its dealerships. These contracts give the dealerships the right to sell Ford brand vehicles, as well as service and perform warranty repairs on Ford's behalf. Ohio Plaintiffs and the members of the Ohio Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products Ford distributes to its authorized dealerships. Ohio Plaintiffs and the members of the Ohio Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than Ford's headquarters.

180. Any attempt by Ford to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Ford knowingly sold defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate to protect Ohio Plaintiffs and the members of the Ohio Sub-Class. Among other things, Ohio Plaintiffs and members of the Ohio Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Ford and unreasonably favored Ford. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Ford and members of the Class. For the same reasons, the provision of Ford's Warranty Guide that purports to bar any warranty-related claim brought in a representative capacity is unconscionable and unenforceable.

181. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Ohio Plaintiffs and the members of the Ohio Sub-Class whole, because Ford has failed and/or has refused to adequately provide the promised remedy, i.e. a permanent repair, within a reasonable time.

182. Ohio Plaintiffs were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Defect from the complaints it received from Class Members, including those formal complaints submitted to NHTSA.

183. Nonetheless, Ohio Plaintiffs provided notice to Ford of the breach of express warranties by presenting their vehicles for the Recall software update, which did not cure the Defect, and by letters dated November 6, 2026, and November 12, 2026, respectively.

184. As a result of Ford's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Ohio Plaintiffs and Ohio Sub-Class members were harmed and suffered actual damages in that the Backup Camera image in the Class Vehicles can freeze while in reverse.

185. As a result of Ford's breach of the express warranty, Ohio Plaintiffs and Ohio Sub-Class Members are entitled to legal and equitable relief against Ford, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT V
**Breach of the Implied Warranty of Merchantability**
**Ohio Rev. Code Ann. § 1302.27, *et seq.***
**(On Behalf of the Ohio Sub-Class)**

186. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 135 above as if fully set forth herein.

187. Ohio Plaintiffs bring this count individually and on behalf of the Ohio Sub-Class against Defendant.

188. Ford is and was at all relevant times a "merchant" with respect to motor vehicles Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

189. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(20).

190. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

191. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ohio Rev. Code Ann. §§ 1302.27 and 1310.19.

192. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like AutoNation Ford Westlake, from whom Ohio Plaintiffs and members of the Ohio Sub-Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Ohio Plaintiffs and members of the Ohio Sub-Class, with no modification to the defective Class Vehicles.

193. Ford provided Ohio Plaintiffs and members of the Ohio Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

194. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated, including while being operated in reverse.

195. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Ohio Plaintiffs and Ohio Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale and thereafter as more fully described above.

196. To the extent Ford contends that its Warranty Guide limits the duration of the implied warranty of merchantability to the duration of the Bumper to Bumper coverage, that

limitation is unconscionable and unenforceable because the Defect is latent, existed at the time of sale, and was known to Ford but not disclosed to consumers.

197. As a result of Ford's breach of the applicable implied warranties, Ohio Plaintiffs and members of the Ohio Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Ohio Plaintiffs and members of the Ohio Sub-Class were harmed and suffered actual damages in that the Backup Camera image in the Class Vehicles can freeze while in reverse.

198. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

199. Ohio Plaintiffs and members of the Ohio Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

200. Ohio Plaintiffs and members of the Ohio Sub-Class were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Defect from the complaints it received from Class Members.

201. Nonetheless, Ohio Plaintiffs provided notice to Ford of the breach of implied warranties by presenting their vehicles for the Recall software update, which did not cure the Defect, and by letters dated November 6, 2026, and November 12, 2026, respectively.

202. Because Ohio Plaintiffs purchased their vehicles from authorized Ford dealerships, they are in privity with Defendant, and privity is not required here because Ohio Plaintiffs and the members of the Ohio Sub-Class are the intended third-party beneficiaries of contracts between Ford and its dealerships, as alleged above.

203. As a direct and proximate cause of Ford's breach, Ohio Plaintiffs and members of the Ohio Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally,

Ohio Plaintiffs and members of the Ohio Sub-Class have incurred or will incur economic damages in the form of the time and expense of presenting their vehicles for repair as well as additional losses.

204. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Ohio Plaintiffs and members of the Ohio Sub-Class have been damaged in an amount to be proven at trial.

**COUNT VI**
**Violation of the Ohio Consumer Sales Practices Act**
**R.C. 1345.01 *et seq.***
**(On Behalf of the Ohio Sub-Class)**

205. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 135 above as if fully set forth herein.

206. Ohio Plaintiffs bring this count individually and on behalf of the Ohio Sub-Class against Defendant.

207. At all relevant times, Ohio Plaintiffs and members of the Ohio Sub-Class are "consumers" as defined by the Ohio Consumer Sales Practices Act ("Ohio CSPA"). *See* OHIO REV. CODE ANN. § 1345.01.

208. Ford is a "supplier" as defined by the Ohio CSPA.

209. Ohio Plaintiffs' and the Ohio Sub-Class Members' purchases or leases of Class Vehicles were "consumer transactions" as defined by the Ohio CSPA.

210. The Ohio CSPA, OHIO REV. CODE ANN. § 1345.03, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction." Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; [and] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not."

OHIO REV. CODE ANN. § 1345.02. Ford's conduct as alleged above and below constitutes unfair and unconscionable acts or practices in consumer sales transactions in violation of OHIO REV. CODE ANN. § 1345.02. By concealing the known defects in the Class Vehicles, Ford participated in unconscionable acts and practices that violated the Ohio CSPA.

211. Ford participated in misleading, false, or deceptive acts that violated the Ohio CSPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

212. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

213. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

214. Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

215. Ford knew or should have known that its conduct violated the Ohio CSPA.

216. Ford's actions as set forth above occurred in the conduct of trade or commerce.

217. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Ford detailed in this complaint, including, but not limited to, the failure to honor implied warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases including, but not limited to, the following: *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382); *State ex rel. Montgomery v. Ford Motor Co.* (OPIF #10002123); *State ex rel. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025); *Bellinger v. Hewlett-Packard Co.*, 2002 WL 533403 (Ohio. Ct. App. Apr. 10, 2002) (OPIF #10002077); *Borror v. MarineMax of Ohio*, 2007 WL 431737 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388); *State ex rel. Petro v. Craftmatic Organization, Inc.* (OPIF #10002347); *Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586); *State ex rel. Brown v. Lyons, et al.* (OPIF #10000304); *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427); *Khouri v. Lewis* (OPIF #10001995); *Mosley v. Performance Mitsubishi aka Automanage, Inc.* (OPIF #10001326); *Walls v. Harry Williams d/b/a Butch's Auto Sales* (OPIF #10001524); and *Brown v. Spears* (OPIF #10000403).

218. Ohio Plaintiffs and the Ohio Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

219. Had Ohio Plaintiffs and the Ohio Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

220. Ford was under a duty to Ohio Plaintiffs and the Ohio Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a) Ford was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b) Ford made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c) Ford actively concealed the defective nature of the Class Vehicles from Ohio Plaintiffs and the Ohio Sub-Class Members at the time of sale and thereafter.

221. By failing to disclose the Defect, Ford knowingly and intentionally concealed material facts and breached their duty not to do so.

222. The facts concealed or not disclosed by Defendant to Ohio Plaintiffs and the Ohio Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase Defendant's Class Vehicles, or to pay less for them. A Backup Camera image that freezes while the vehicle is in reverse gives the driver a false representation of the vehicle's surroundings and increases the risk of a crash, thereby putting consumers, passengers, and bystanders in danger; that is a material safety concern. Had Ohio Plaintiffs and the Ohio Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased the Class Vehicles or would have paid less for them.

223. Ohio Plaintiffs and the Ohio Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

224. As a result of Defendant's misconduct, Ohio Plaintiffs and the Ohio Sub-Class Members have suffered actual damages in that the Class Vehicles are defective and require repairs.

225. As a direct and proximate result of Defendant's unfair, deceptive, or unconscionable acts or practices, Ohio Plaintiffs and the Ohio Sub-Class Members have suffered and will continue to suffer ascertainable loss and actual damages.

226. Ford's violations present a continuing risk to Ohio Plaintiffs and the Ohio Sub-Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

227. Ohio Plaintiffs and the Ohio Sub-Class Members seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining Ford's deceptive and unfair conduct, court costs and attorneys' fees as a result of Ford's violations of the Ohio CSPA as provided in OHIO REV. CODE ANN. § 1345.09.

## PRAYER FOR RELIEF

228. WHEREFORE, Plaintiffs, individually and on behalf of the members of the Nationwide and State Classes, respectfully request that the Court certify the proposed Nationwide and State Classes, including designating the named Plaintiffs as representatives of the Nationwide Class and their respective State Class and appointing the undersigned as Class Counsel, and the designation of any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in Plaintiffs' favor and against Ford including the following relief:

a) A declaration that any applicable statutes of limitations are tolled due to Ford's fraudulent concealment and that Ford is estopped from relying on any statutes of limitations in defense;

b) Restitution, compensatory damages, and costs for economic loss and out-of-pocket costs;

c) Punitive and exemplary damages under applicable law;

d) Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by Plaintiffs or Class member to remedy the Defect;

e) An order enjoining Ford from continuing the wrongful conduct alleged herein and requiring Ford to provide, at no cost to Class members, a repair that permanently corrects the Defect;

f) A determination that Ford is financially responsible for all Class notices and the administration of Class relief;

g) Any applicable statutory or civil penalties;

h) An order requiring Ford to pay both pre-judgment and post-judgment interest on any amounts awarded;

i) An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

j) Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

k) Any such other and further relief the Court deems just and equitable.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated: November 17, 2026

BERGER MONTAGUE PC

/s/ Russell D. Paul
Russell D. Paul (#4647)
BERGER MONTAGUE PC
800 N. West Street, Suite 200
Wilmington, DE 19801
Tel.: (215) 875-4601
Fax: (215) 875-4604
rpaul@bergermontague.com

Adam A. Edwards (*PHV* forthcoming)
William A. Ladnier (*PHV* forthcoming)

Amey J. Park (*PHV* forthcoming)
Virginia Ann Whitener (*PHV* forthcoming)
MILBERG, PLCC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.: 865-247-0080
Fax: 856-522-0049
aedwards@milber.com
wladnier@milberg.com
apark@milberg.com
gwhitener@milberg.com

Tarek H. Zohdy
Laura E. Goolsby
Ahmed H. Yousef
DRAKE LAW FIRM
19935 Venture Blvd.,
Third Floor
Woodland Hills, CA 91364
Tel.: 888-315-5721
tarek@drakelawgroup.com
lgoolsby@drakelawgroup.com
ahmed@drakelawgroup.com

***Counsel for Plaintiffs and the Proposed Classes***